J-S18030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| STEVEN CARL COLEGROVE | : | |
| | : | |
| Appellant | : | No. 1220 MDA 2019 |

Appeal from the PCRA Order Entered June 21, 2019
In the Court of Common Pleas of Bradford County
Criminal Division at No(s):  CP-08-CR-0000785-2007

BEFORE:   KUNSELMAN, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                          **FILED JULY 02, 2020**

Appellant, Steven Carl Colegrove, appeals from the order entered in the Bradford County Court of Common Pleas, which denied his first petition filed under the Post Conviction Relief Act ("PCRA"), at 42 Pa.C.S.A. §§ 9541-9546. We affirm.

This Court has previously summarized some of the relevant facts and procedural history of this case as follows:

> On August 8, 2007, [Appellant's] father, Joseph Colegrove ("Joseph"),[1] mother, Marlene Colegrove ("Marlene"), and brother, Michael Colegrove ("Michael"), were each shot two times, including fatal wounds to the head, by a 12-gauge shotgun in the family home near Wyalusing, Pennsylvania. The circumstances surrounding the murders indicated that

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Paternity testing performed in this case confirmed that Joseph is not the biological father of Appellant.

the murders occurred between midnight and 6 a.m.; however, the bodies were not discovered until the late afternoon. Joseph and Marlene had two surviving sons, [Appellant] and Robert Colegrove ("Robert"). [Appellant] had been estranged from his parents from 1999-2005; however, he did have contact with Marlene and Michael prior to the murders. Robert had limited contact with the family after 2005 due to a falling out between his wife [Heather Colegrove ("Heather")] and Marlene. At the time of the murders, [Appellant] was living in Deposit, New York, which was approximately 77 miles from the family home.

[Appellant] contacted the Pennsylvania State Police [("PSP")] and agreed to be interviewed on August 9, 2007. At that time, [Appellant] told the police that his mother had purportedly written Robert out of her will and that the estate would be left to [Appellant] and Michael. Marlene had a life insurance policy worth $100,000. [Appellant] also stated that he never left New York State the night of the murders and that he had previously served honorably in the Air Force. [Appellant] spoke with the police again the following date. Prior to the interview, [Appellant] executed a Rights Warning and Consent Form. The interviewing troopers confronted [Appellant] about inconsistencies in his statements to police, including his military service. The troopers then asked [Appellant] to see his shoulder, which had bruising consistent with shotgun recoil. As a result, Trooper David Pelachick accused [Appellant] of committing the murders. [Appellant] denied the accusation and stated, "Maybe I ought to get a lawyer." Trooper Pelachick and the other troopers left the room after this statement. Shortly thereafter, Trooper Michael Golay returned to the room and asked [Appellant] whether [Appellant] wished to speak to him. [Appellant] agreed to speak to Trooper Golay and stated that he had disposed of some clothes the morning of the murders, but not those worn the night prior to the murders. [Appellant] also stated that his fingerprints may be at the murder scene because he had visited his parents recently. [Appellant], however, maintained his innocence and stated that he did not learn of the deaths until the following day. [Appellant] then declined to speak about the matter further, after which the police arrested him.

During the questioning, the New York State Police went to

[Appellant's] residence which he shared with Robert Rynearson ("Rynearson"). While there, the police discovered a shotgun that belonged to Rynearson. A subsequent examination of the shotgun revealed Michael's blood on and in the barrel of the shotgun, and that the shotgun matched the empty cartridges found at the scene. The police also determined that [Appellant] had been telling his friends and ex-girlfriend that he would be coming into money prior to the murders.

***Commonwealth v. Colegrove***, No. 1391 MDA 2009, unpublished memorandum at 1-3 (Pa.Super. filed January 7, 2011) (internal footnote omitted).

With respect to the initial examination of the shotgun, the report from the PSP laboratory confirmed that Michael's DNA matched two stains from the barrel of the shotgun found in Appellant's home. Another DNA profile recovered from the shotgun showed a mixture, which included a major component matching Michael's DNA, and additional alleles from an unknown source. The examination excluded Joseph, Marlene, and Appellant as contributors of the minor alleles.

Appellant proceeded to a jury trial in January 2009.[2] The defense theory of the case was that Robert, Heather, Rynearson, or an unknown perpetrator had committed the murders. During opening statements, the defense relied on the "unknown source" obtained in the DNA analysis to support its theory that someone other than Appellant had committed the murders.

_____

[2] William Miele, Esq. and Helen Stolinas, Esq. represented Appellant at trial.

- 3 -

On the evening of January 20, 2009, after the first day of trial and opening statements, the Commonwealth received information from the lab indicating that a more expansive database search revealed the "unknown source" was actually a lab technician. Upon the Commonwealth's disclosure of this new evidence the next day, the defense objected to its introduction and requested a mistrial. The following exchange occurred between the court and counsel:

> THE COURT: Okay, did you have any testing [when you received the initial DNA report] by yourself?
>
> MR. MIELE: No, we didn't get the materials from it because it was—
>
> MS. STOLINAS: The sample was I believe—the sample was expended.
>
> MR. MIELE: Yeah, so we had no opportunity to do [independent testing].
>
> MS. STOLINAS: But we did have the notes reviewed.
>
> MR. MIELE: And the protocols.
>
> THE COURT: Okay.
>
> MS. STOLINAS: And I believe the sample was expended.
>
>             *    *    *
>
> THE COURT: Well, well, regardless I'm—I'm going to deny the motion for the objection of its admissibility, and deny the motion for mistrial.
>
> MR. MIELE: How can you—
>
> THE COURT: Because you had—you know the report

was there, that there was an unknown DNA sample, you have known it for a year and you could have had—you could have had—you could have asked the court, requested the court to have Robert and Heather tested.

MR. MIELE:     But that's not the issue about being Robert's or Heather's.  How can we proceed now, we just—we knew up until this moment there was an unknown DNA, we represented to the jury there was an unknown DNA and in the middle of trial we're told it belongs to someone else.  We have no opportunity to test it ourselves, we have no opportunity to challenge the protocol, the procedures, and the admissibility.  We can't even subpoena the original people that—person that tested it because she's unavailable due to the fact that she had a baby, so we can't even question her.

I realize you don't want to stop the trial in the middle after all the work we've done, but do you want to re-do it?  I can't imagine how an [appellate] court would not find this prejudicial.  That we're—we're a year into it, the sample is expended, there's no way we could have ever found out it belonged to somebody else if we had taken it to another lab because we didn't have the—we didn't have the DNA protocol of the person from the lab.  There's no way we could have ever found that out.

MS. STOLINAS:     The lab that did the testing didn't even figure it out [until] this week.  How [would we] be expected to.

*     *     *

MR. MIELE:     Judge just for the record we want to make—make sure some things are clear for—first of all the District Attorney has told us that they confirm that the blood was consumed in the analysis so we had no ability to check it ourselves.

Second of all, what we received was a copy of the report of such, we did not have access to the DNA profile of employees at the—at the state police lab, therefore, we would have had absolutely no means whatsoever to determine that that DNA belonged to a member of the lab.

- 5 -

> This was something that was entirely within the control of the Commonwealth and we were totally at their mercy because of the fact that they consumed the same. And even if they hadn't consumed the sample, we would have had no way to know who—it belonged to a member of the lab, because again we didn't have access to their—to their DNA profiles.
>
> What we're requesting the [c]ourt order the Commonwealth to do, if in fact you're going to allow this into evidence, and second of all if in fact you will not grant us a mistrial regardless of—in spite of the prejudice that we're certainly suffering at this point, is that we be given the DNA profile of the lab tech who's DNA it belongs to and all his information so that we can attempt in the next few days to have our experts review it to see if the information is correct.
>
> Second of all, we will be calling the lab, someone from our lab as an expert to testify about the problems in labs and the kind of situation that—the kind of problems this indicates may exist in the state police lab. …

(N.T. Trial, 1/21/09, at 11-15). Based on defense counsels' statements, the Commonwealth said it would consider stipulating to the DNA evidence based on the initial report, to tell the jury the contributor of the minor alleles was an "unknown source." By entering that stipulation, the Commonwealth argued the defense would essentially be getting what it wanted in terms of excluding the new DNA evidence. The court said it would leave the issue open until the parties had a chance to review the proposed stipulation.

On January 23, 2009, the parties stipulated that the lab's examination of the shotgun revealed Michael's DNA on a spot of blood inside the barrel of the shotgun, and other human DNA mixed with Michael's blood that could not be identified. Thus, the stipulation allowed Appellant to continue pursuit of

the defense strategy regarding the "unknown source." (**See** N.T. Trial, 1/23/09, at 9).

Nevertheless, the Commonwealth's circumstantial evidence against Appellant showed, *inter alia*: (1) Joseph, Marlene, and Michael died from gunshots to the head; (2) the shotgun used in the murders was found at Appellant's home in New York with blood on it from Michael; (3) toolmark identification indicated that the shells found at the crime scene were fired from the shotgun recovered in Appellant's home; (4) Appellant had a bruise on his shoulder consistent with shotgun recoil; and (5) Appellant had a financial motive to commit the murders.

On January 27, 2009, a jury convicted Appellant of three counts of first-degree murder and three counts of third-degree murder. The court sentenced Appellant on February 26, 2009, to consecutive terms of life imprisonment for the first-degree murder convictions.[3] This Court affirmed the judgment of sentence on January 7, 2011, and our Supreme Court denied allowance of appeal on January 3, 2012. **See Commonwealth v. Colegrove**, 23 A.3d 1077 (Pa.Super. 2011) (unpublished memorandum), *appeal denied*, 613 Pa. 650, 34 A.3d 81 (2012).

On January 7, 2013, Appellant timely filed a *pro se* PCRA petition. The

---

[3] The Commonwealth sought capital punishment in this case. The jury could not reach a unanimous verdict as to a death sentence, so the court imposed the prison sentence. At sentencing, the court said the third-degree murder convictions merged with the first-degree murder convictions.

court appointed counsel, who filed an amended PCRA petition on March 13, 2015. In his petitions, Appellant alleged trial counsel were ineffective in stipulating to the DNA analysis at trial. Specifically, Appellant claimed trial counsel failed to investigate the "unknown source" stated in the initial DNA report, as well as an unidentified fingerprint recovered from the crime scene. Appellant claimed the lab's inconsistent analyses were the result of cross-contamination and improper quality control standards. Thus, Appellant insisted trial counsel should have conducted independent DNA analysis, because the subsequent DNA results indicating the "unknown source" was actually a lab technician could not have been reliable.

Assuming the lab's amended analysis was flawed, Appellant further asserted that trial counsel were ineffective for failing to subpoena the DNA of Robert, Heather, and Rynearson, to see if any of those individuals matched the "unknown source" DNA. Appellant also suggested trial counsel could have searched other DNA data banks to locate a match to the "unknown source."

The court held a PCRA hearing on June 21, 2016, during which Appellant presented testimony from Attorney Miele, Attorney Stolinas, and himself. Attorney Miele admitted that Robert had a strained relationship with Marlene and that witnesses observed Robert cleaning his truck shortly after the murders. Attorney Miele also conceded that Robert had an argument with Marlene and called her names shortly before the murders. When questioned about why Attorney Miele did not seek DNA testing of Robert or Heather in

light of this evidence, counsel explained:

> Sometimes from a defense point of view, you're better off with a question than an answer because you don't like the answer. For instance, the DNA you're talking about, wasn't that later identified as belonging to somebody in the lab of the State Police[?] Therefore, if I would've,--if we would've had the DNA done, it would have eliminated them. Aren't we better off as a defense, not knowing who the DNA belongs to and then being able to assert that the [Commonwealth] failed to do their job? And if I recall correctly, we spent a lot of time attacking Robert. We spent a lot of time saying that they were the ones. We introduced testimony from various people saying that the mother said if something happens to me, look at him. And threats and bad relation, the bad relationship between them. So what we did is we tried to set up a situation where we could point towards the brother. And at the time we didn't know who the DNA belonged to, and then be able to say, since we have no burden of proof, it's on the Commonwealth. And again, as you know and I know, as we got to trial, the Commonwealth was able to identify the DNA as belonging to somebody in the Lab. So the fact that we didn't do it, to me, really doesn't seem to matter, since it was later identified anyway as not being…Robert's [DNA].

(N.T. PCRA Hearing, 6/21/19, at 12-13). Attorney Miele explained that he entered into the stipulation regarding the DNA evidence so the defense could continue to suggest Robert, Heather, Rynearson, or someone else was the "unknown source" of the DNA mixed with Michael's blood. After receipt of the new DNA evidence, Attorney Miele testified that the defense contacted the head of the defense death penalty clinic as well as a DNA expert to discuss the updated results; the defense strategy remained the same.

Attorney Miele also stated that Appellant did not object to the stipulation. Had Appellant requested the lab technician come into court to

testify about the DNA testing procedures, Attorney Miele maintained he would have done as Appellant asked. Attorney Miele further explained that he did not have the resources as defense counsel to test the fingerprint recovered from the crime scene independently. Attorney Miele indicated the Commonwealth had run the fingerprint through its database and was unable to recover a match. (*See id.* at 4-33).

Attorney Stolinas testified that prior to trial, the defense hired an independent DNA expert from National Medical Services to review the DNA protocols and procedures with respect to the initial DNA analysis. Attorney Stolinas recalled the defense making a discovery request for the notes and more detailed process the lab had undertaken, and forwarding those to the independent DNA expert. (*Id.* at 34-50).

Appellant testified that Attorney Miele "kept pushing" for the stipulation, even though Appellant wanted the lab technician to testify at trial. Appellant said he was unaware of any independent DNA analysis by the defense. Appellant claimed he asked counsel to have Robert, Heather, and Rynearson's DNA tested, but Attorney Miele told him it was unnecessary. (*Id.* at 51-69). The court deferred its ruling pending submission of post-hearing briefs.

On June 21, 2019, the court denied PCRA relief.[4] Appellant timely filed

_____

[4] On December 29, 2017, Appellant filed a separate motion for DNA testing, requesting samples of Robert and Heather's DNA for comparison with the "unknown source" particle. The parties discussed the possibility of DNA

a notice of appeal on Monday, July 22, 2019. On July 29, 2019, the court ordered Appellant to file a concise statement of errors complained of on appeal. Appellant subsequently filed his Rule 1925(b) statement.

Appellant raises two issues for our review:

> DID THE PCRA COURT COMMIT ERROR IN FAILING TO FIND THAT [APPELLANT]'S TRIAL ATTORNEYS WERE "INEFFECTIVE" AND [APPELLANT] PREJUDICED GIVEN THAT THE ATTORNEYS FAILED TO CONDUCT A REASONABLE PRE-TRIAL INVESTIGATION?

> SHOULD THE PCRA COURT HAVE PERMITTED [APPELLANT] TO PURSUE DNA AND FINGERPRINT EVIDENCE AND UTILIZE EXPERTS IN THESE PURSUITS BEFORE THE COURT ADDRESSED THE ISSUE OF "PREJUDICE" TO…APPELLANT?

(Appellant's Brief at 1-2).

Our standard of review of the denial of a PCRA petition is limited to examining whether the record evidence supports the court's determination and whether the court's decision is free of legal error. *Commonwealth v. Ford*, 947 A.2d 1251 (Pa.Super. 2008), *appeal denied*, 598 Pa. 779, 959 A.2d 319 (2008). This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings. *Commonwealth*

---

testing at the PCRA hearing, during which PCRA counsel conceded that Robert is now deceased and his body would have to be exhumed for DNA testing. The court did not expressly rule on Appellant's December 29, 2017 motion in its order denying PCRA relief, and the record does not contain a separate order denying that motion. Nevertheless, the court's failure to rule on the motion for DNA testing does not impede our review in this case. *See generally Commonwealth v. Scarborough*, 619 Pa. 353, 64 A.3d 602 (2013) (explaining that litigation of motion for DNA testing is, in substance, wholly separate proceeding from litigation of PCRA petition).

*v. Boyd*, 923 A.2d 513 (Pa.Super. 2007), *appeal denied*, 593 Pa. 754, 932 A.2d 74 (2007). If the record supports a post-conviction court's credibility determination, it is binding on the appellate court. ***Commonwealth v. Dennis***, 609 Pa. 442, 17 A.3d 297 (2011).

In his issues combined, Appellant asserts the defense trial strategy was to suggest that Robert, Heather, or Rynearson committed the murders. Appellant argues counsel should have obtained DNA testing of those three individuals. Appellant suggests additional DNA testing might have produced a match from Robert, Heather, or Rynearson to the "unknown source" particle found mixed with Michael's blood on the murder weapon. Appellant claims he wanted DNA testing of Robert, Heather, and Rynearson at the time of trial.

Appellant also insists counsel should have called the lab technician to testify instead of stipulating to the results of the DNA report. Appellant avers the stipulation did not "scientifically" identify the source of the DNA mixed with Michael's DNA. Appellant emphasizes the conflicting results of the initial DNA report and the subsequent DNA report. Appellant maintains the DNA results lacked credibility, so trial counsel should have conducted independent DNA testing. Appellant complains counsel were ineffective for relying on the Commonwealth's evidence of the DNA results when no evidence established the lab utilized proper protocols.

Appellant concedes he cannot establish prejudice under the ineffectiveness test because he does not have DNA testing from Robert,

Heather, or Rynearson. Appellant submits the court ruled on his ineffectiveness claims prematurely, because the court should have permitted Appellant to secure DNA testing of Robert, Heather, and Rynearson first, so Appellant could then establish prejudice. Appellant concludes trial counsel were ineffective, and this Court must reverse the order denying PCRA relief and remand for further proceedings.[5] We disagree.

The law presumes counsel has rendered effective assistance. *Commonwealth v. Gonzalez*, 858 A.2d 1219 (Pa.Super. 2004), *appeal denied*, 582 Pa. 695, 871 A.2d 189 (2005). In general, to prevail on a claim of ineffective assistance of counsel, a petitioner must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Turetsky*, 925 A.2d 876 (Pa.Super. 2007), *appeal denied*, 596 Pa. 707, 940 A.2d 365 (2007). The petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable strategic basis for his action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the

---

[5] Appellant also mentions counsels' alleged ineffectiveness for failure to obtain an independent analysis of a fingerprint recovered from the crime scene. Nevertheless, Appellant fails to develop this argument adequately on appeal, so it is waived. *See Commonwealth v. Freeman*, 128 A.3d 1231 (Pa.Super. 2015) (holding appellant's failure to develop coherent legal argument in support of his claim resulted in waiver of issue on appeal).

proceedings would have been different. *Id.* at 880. "The petitioner bears the burden of proving all three prongs of the test." *Id.*

Regarding the second prong of the ineffectiveness test, our Supreme Court has explained:

> [W]e do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if [a]ppellant proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

*Commonwealth v. Chmiel*, 612 Pa. 333, 361-62, 30 A.3d 1111, 1127 (2011) (internal citations and quotation marks omitted).

Instantly, the PCRA court addressed Appellant's claims as follows:

> The crux of [Appellant's] PCRA Petition evolves around the murder weapon, a shotgun. The shotgun, found in a truck at [Appellant's] then residence, had [three] particles of matter on the inside of the barrel. The particles were tested for DNA by the [PSP] Laboratory. [Two] such particles contained DNA of victim, Michael Colegrove. The 3rd particle contained DNA that was unknown or unidentified.
>
> 1. [Appellant's] claim that counsel [were] ineffective in not obtaining a DNA testing for Robert or Heather Colegrove or Robert [Rynearson] to compare to the unidentified particle within the murder weapon is without merit. Trial counsel had a tactical basis for their action. Counsel testified at the PCRA hearing, that their trial strategy was to argue that Robert or Heather Colegrove or some unknown third person was the murderer. They introduced testimony from various individuals to show there were threats and bad relations between Robert and Heather Colegrove and the victims, Robert Colegrove's and [Appellant's] parents. Counsel believed it was advantageous to have the particle unidentified. Even after the State Police lab identified this particle as belonging to a laboratory employee, a stipulation

- 14 -

was entered into between the Commonwealth and [Appellant] to have the particle remain unknown. (This was due to the lateness of discovery on the second day of trial after opening statements). Defense was able to continue to argue that [the] particle belonged to some unknown third party, whether it was Robert Colegrove or someone else. Further, upon learning that the unknown particle was identified as belonging to a lab technician, counsel consulted with head of the defense death penalty clinic and a DNA expert. Trial strategy remained the same. Counsel had a reasonable basis for not requesting DNA testing.

Defense counsel did hire a DNA expert from National Medical Services near Philadelphia to review the DNA testing that was done to be sure protocol was followed. Counsel cannot be found ineffective for failing to hire an expert which will do nothing more than confirm the Commonwealth's evidence.

[Appellant's] claim that he requested DNA testing be done on the unidentified particle is not credible and meritless. Trial [c]ounsel…did not recall [Appellant] insisting upon said testing or to have the laboratory personnel called to testify and cross-examine. Trial counsel testified they discussed this with [Appellant]. Further, when reaching the stipulation for the unidentified particle, during trial, trial counsel indicated they needed time to speak to their client about it and asked for time to do so. The trial strategy of having the particle remain unidentified was continued to be pursued. … [Appellant's] testimony was not credible.

Eventually, on the eve of trial or after opening statements, the unidentified particle was identified. Trial counsel testified that a discussion with [Appellant] would have taken place to review the stipulation that was entered so they could maintain their trial strategy of an unknown. As trial counsel testified, once the particle was identified as not belonging to Robert or Heather Colegrove, then their trial strategy of implicating them is much weaker.

As this particle is now identified as a lab employee [Appellant's] hope that the particle would belong to someone else to blame is moot. Had counsel obtained a separate DNA test to compare Robert and Heather

- 15 -

Colegrove and Robert [Rynearson], the evidence would then exclude those individuals.

[Appellant's] remaining claims in this regard are meritless as well. Upon learning [of] the identity of the unidentified particle, trial counsel did move to suppress same, moved for a mistrial and requested time to potentially hire an expert, etc.

[Appellant's] Amended Petition makes reference to the [PSP] lab failing to maintain proper quality control during the DNA testing. However, [Appellant] has presented no evidence nor pointed to any area of the trial record to support this claim or the claim for ineffectiveness of counsel resulting therefrom.

(PCRA Court Opinion, filed June 26, 2019, at 3-5) (internal citations omitted).

The record supports the court's analysis. *See Ford, supra*; *Boyd, supra*. We will not disturb the PCRA court's credibility determinations in favor of trial counsel and against Appellant. *See Dennis, supra*. Significantly, the record makes clear trial counsel had a reasonable trial strategy in pursuing the "unknown source" theory, and trial counsel were successful in being able to continue pursuit of that theory by way of the stipulation, even after new evidence showed the DNA mixed with Michael's blood was from a lab employee.

Throughout his arguments in favor of DNA testing of Robert, Heather, or Rynearson, Appellant assumes the updated lab results were due to "cross contamination" or "quality control" issues. As the PCRA court stated, however, nothing in the record supports these contentions. Rather, the record demonstrates that defense counsel hired a DNA expert to review the

procedures and protocols utilized in the initial DNA analysis. That expert did not suggest the PSP lab's analysis was flawed. Upon preparation for courtroom presentation, the PSP lab performed an additional database search on the previously unidentified source, which confirmed the presence of the lab technician's DNA. Thus, the record shows that a "re-run" of the examination merely widened the database to include lab employees.

Consequently, trial counsel had a reasonable strategic basis for entering into the stipulation and declining to seek a DNA test from Robert, Heather, or Rynearson, as the results of those DNA tests would have only weakened the defense theory of the case. Appellant simply cannot prove "that an alternative not chosen offered a potential for success substantially greater than the course actually pursued."[6] *See Chmiel, supra*. Based upon the foregoing, we affirm the order denying PCRA relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/2/2020

---

[6] Due to our disposition, we need not consider Appellant's argument that the court should have first permitted the DNA testing so that Appellant could then establish prejudice. *See Turetsky, supra*.